# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| Don McCann III<br>*Administrator of the estate of*<br>*James Daniel McCann, deceased*<br>494 Stanford Street<br>Akron, Ohio 44314<br><br>　　　　　　Plaintiff,<br>　　vs.<br><br>CoreCivic, Inc. d/b/a<br>Northeast Ohio Correctional Center<br>c/o CT Corporations System<br>4400 Easton Commons Way, Suite 125<br>Columbus, Ohio 43219<br><br>Annette Chambers-Smith<br>*In her individual capacity*<br>c/o Ohio Dept. of Rehabilitation & Correction<br>4545 Fisher Rd., Suite D<br>Columbus, Ohio 43228<br><br>Gary Mohr<br>*In his individual capacity*<br>221 Saint Clair Drive<br>Chillicothe, Ohio 45601<br><br>Nicole Vanhorn<br>*In her individual capacity*<br>c/o Northeast Ohio Correctional Center<br>c/o CT Corporations System<br>4400 Easton Commons Way, Suite 125<br>Columbus, Ohio 43219<br><br>Damon T. Hininger<br>*In his individual capacity*<br>c/o Northeast Ohio Correctional Center<br>c/o CT Corporations System<br>4400 Easton Commons Way, Suite 125<br>Columbus, Ohio 43219 | Case No. _____<br><br>Judge _____<br><br>**Complaint with Jury Demand** |

| |  |
|---|---|
| NEOCC corrections officers Armstrong, Bower, Brown, Clayton, Cuevas, Davis, Detchon, Douglass, Fletcher, Hinojos, Kaufman, Lattner, Gonzales, Miller, Miner, Osborn, Pleiss, Plott, Robinson, Sanders, Sturgis, Walters, and other unknown officers<br>*In their individual capacities*<br>c/o Northeast Ohio Correctional Center<br>c/o CT Corporations System<br>4400 Easton Commons Way, Suite 125<br>Columbus, Ohio 43219<br><br>                  Defendants. | |

## I. Introduction

1. This lawsuit is asserted by the estate of James D. McCann, who died of pneumonia at the age of 36 while incarcerated by the State of Ohio in the Northeast Ohio Correctional Center ("NEOCC"), a privately owned prison operated by Defendant CoreCivic, Inc., as a result of having been denied access to basic medical care by CoreCivic and its officers.

2. On May 6, 2019, McCann was suffering from chest pain so severe that he could not breathe or move, so he sought medical attention from NEOCC's medical staff. Upon evaluating McCann in the medical pod, a nurse practitioner scheduled him an appointment with a doctor on May 10 for further assessment and care. For reasons that are to date unknown, McCann did not attend the May 10 doctor's appointment.

3. By the next day, May 11, McCann remained in severe pain and—as documented in a letter sent to McCann's family by fellow inmate John Auman—asked on-duty NEOCC officer, Defendant Nicole VanHorn, to be sent back to the medical pod for attention.

4. VanHorn denied McCann's request to go to the medical pod, and the next day McCann was found dead in his cell. After performing an autopsy, the Mahoning County Coroner's Office concluded that McCann's death was the result of "acute pneumonia," a condition that would not have been fatal had it been subject to basic medical attention.

5. McCann's death thus directly and proximately resulted from the deliberate indifference of VanHorn in denying his request for medical care on May 11, 2019, and also, independently, from the deliberate indifference of other NEOCC officers who were on notice of McCann's need for medical care but denied him access to the same, including by denying him access to the medical pod for his May 10 appointment.

6. McCann's death would have been prevented if not for CoreCivic's failure to train and supervise its correctional officers on their duty to provide basic access to medical care, and its failure to implement basic systems to ensure the same. CoreCivic's deliberate indifference to the inadequate training of its employees has produced officers who are ignorant of the constitutional standards governing inmates' Eighth Amendment rights to medical care in the jail setting, resulting in the predictable and violation of those rights.

7. McCann's death was similarly independently, directly, and proximately caused by the failure of Defendants Annette Chambers-Smith and Gary Mohr, the current and former director of the Ohio Department of Rehabilitation and Corrections ("ODRC"), who failed to supervise the State's contract with NEOCC even in the face of clear evidence of CoreCivic's highly publicized and "disgraceful track record of neglected medical care."

8. To date, no one at NEOCC, or ODRC has been terminated or disciplined in any way in connection with McCann's death. And according to documents produced in response to public records requests, neither organization has even bothered to conduct an investigation as to how an otherwise healthy 36-year-old man died in their custody from a treatable and non-fatal illness, let alone make an effort to improve NEOCC's processes to ensure against such needless deaths occurring in the future.

9. Had McCann—the father of two daughters who are now 10 and 11-years-old—not died while incarcerated at NEOCC on May 12, 2019, his prison sentence would have expired this

September, and he would have been eligible for early release as soon as November of last year.

10. As set forth fully below, Defendants are liable to McCann's estate under Ohio's wrongful death statute, and under 42 U.S.C. § 1983 for their deliberate indifference to McCann's need for basic medical care while incarcerated at NEOCC.

## II. Parties

11. Plaintiff Don McCann III is the duly authorized Administrator of the Estate of James Daniel McCann pursuant to Summit County Probate Court case number 2020-ES-00345 (the "Estate"). In his capacity as Administrator, Plaintiff brings the instant lawsuit for the exclusive benefit of the surviving next of kin of McCann, the decedent.

12. At all times relevant, McCann was a resident of Akron, Ohio who was detained as a prisoner of the State of Ohio at NEOCC in Youngstown, Ohio.

13. Defendant CoreCivic is a corporation that operates for-profit prisons and detention facilities throughout the United States, and maximizes value for its private shareholders by offering a minimum of staffing and service for the highest obtainable price to the governmental entities with whom it contracts to house detainees. Its principal place of business is in Nashville, Tennessee.

14. Defendant Damon Hininger has been CoreCivic's Chief Executive Officer since 2009 and resides in Nashville, Tennessee. For the fiscal year 2019, CoreCivic paid him $5,329,357 in salary and bonuses.

15. At all times relevant, CoreCivic operated NEOCC pursuant to a contract with the ODRC to perform the State's obligation to provide for the care, custody, and control of Ohio prisoners detained at NEOCC. By operating NEOCC on behalf of the ODRC, CoreCivic and its employees and staff were performing public functions traditionally reserved to the State of Ohio and were thus acting under the color of state law for purposes of 42 U.S.C. § 1983.

16. Defendant Annette Chambers-Smith, who has been the director of the ODRC since January

2019, and Gary Mohr, who served as director until September 2018, are and were responsible for supervising the performance of ODRC's contract with CoreCivic, including by ensuring that CoreCivic operated NEOCC in a constitutionally-adequate manner rather than in a manner that routinely violated the constitutional rights of inmates detained therein. This lawsuit is brought against Chambers-Smith and Mohr in their individual capacities.

17. At all times relevant, Defendant Vanhorn and the other NEOCC officer Defendants—Armstrong, Bower, Brown, Clayton, Cuevas, Davis, Detchon, Douglass, Fletcher, Hinojos, Kaufman, Lattner, Gonzales, Miller, Miner, Osborn, Pleiss, Plott, Robinson, Sanders, Sturgis, Vanhorn, Walters, and all other officers on duty in NEOCC's Charlie 2-4-6 housing unit between May 6 and May 12, 2019, whose full names are to date unknown despite Plaintiff's reasonable efforts to identify them—were employed by CoreCivic as corrections officers, and were responsible for preventing cruel, unusual, and unnecessary risks of harm to the health and safety of NEOCC inmates under CoreCivic's custody, care, and control.[1] This lawsuit is brought against Vanhorn and the other NEOCC officers in their individual capacities.

### III. Jurisdiction and Venue

18. This Court has federal-question jurisdiction over this action pursuant to 28 U.S.C. § 1331 for the claims raised under 42 U.S.C. § 1983 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for the claims raised under Ohio law.

19. This Court has jurisdiction over Defendants because CoreCivic operates NEOCC, whose conduct is at issue in this litigation, and the individual Defendants are employed by CoreCivic to work at NEOCC or are otherwise responsible for overseeing CoreCivic's operation of NEOCC.

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the ODRC

---

[1] Plaintiff expects to shortly identify and locate each of these officers pursuant to pending public records requests that have been served upon CoreCivic, as well as, if necessary, discovery requests to be served immediately upon CoreCivic, and will accordingly amend this Complaint immediately upon receipt of this information.

Defendants reside in Franklin County, Ohio, and a substantial part of their actions and omissions upon which the claims in this litigation are based—including the State's decision to contract with CoreCivic to house its inmates, and its failure to supervise that contract—took place in Franklin County, Ohio.

## IV. Facts

21. CoreCivic is one of the largest private for-profit corrections companies in the country, owning and operating hundreds of private prisons, jails, and detention facilities throughout the United States.

22. CoreCivic has in the past and continues to operate NEOCC pursuant to a pattern, practice, custom, and policy of failing to adequately staff the facility and failing to train its corrections officers on how to perform the basic duties of their job so as not to violate the inmates' constitutional rights, including the duty of such officers to provide inmates access to medical care. CoreCivic's failure to adequately train its officers has been documented as a serious and reoccurring problem at NEOCC since at least 2014, when, as discussed below, CoreCivic lost its contract to house federal prisoners at NEOCC following inmate protests over medical care.

23. In August 2014, 140 inmates detained at NEOCC staged a fourteen-hour protest against the facility's "unsanitary food conditions, lack of medical care, inadequate programming, and the unfair use of solitary confinement."[2] Following that protest, the Correctional Institution Inspection Committee ("CIIC"), the state legislative committee tasked with providing oversight to Ohio's correctional facilities, conducted an investigation of CoreCivic's operation of NEOCC pursuant to its duty to provide "an unvarnished view of current corrections in Ohio," "keep[] its finger on the pulse of current issues in Ohio prisons," and "provide[] expert recommendations for operational

---

[2] Mike Brickner, "Corrections Corporation of America's Loss is Ohio's Gain," *ACLU* (Jan. 9, 2015), https://www.aclu.org/blog/speakeasy/corrections-corporation-americas-loss-ohios-gain

improvements."[3]

24.     After concluding its investigation, the CIIC issued a report finding that "medical care continues to be ... [a] primary concern relayed by inmates dating back to 2006" and that "[s]ince January 2014, the majority of letters to CIIC from NEOCC inmates have relayed concerns regarding medical care at the institution, particularly regarding inadequate/denial of treatment, including access to specialty consults."[4]

25.     The CIIC report also noted that inmates' complaints concerning CoreCivic's failures to provide adequate medical care had been a constant problem for years, including in 2006 ("[I]nmates reported that they were denied medical treatment and medical aids"), 2009 ("[H]ealth care was the top reported concern to CIIC"), 2011 ("[I]nmates reported that medical services were inadequate, deficient, and unprofessional, with staff indifferent and slow to respond to medical needs"), and 2013 (reporting "a general lack of access to mental health services"). *Id.*, p. 6, note 8. Accordingly, CIIC advised "that CoreCivic "[c]onsider evaluating inmate concerns regarding the timeliness of medical care and access to outside specialists." *Id.*, p. 7, 12.

26.     In December 2014, the Federal Bureau of Prisons announced that it would no longer house inmates at NEOCC after "a recent audit found the private facilities have more safety and security problems than ones run by the government."[5] In response, the Ohio American Civil Liberties Union issued a statement noting its "pleas[ure] that the Bureau of Prisons ... decided not to renew its contract with [CoreCivic]" due to its "disgraceful" "track record of ... increased violence and drug

---

[3] Correctional Institution Inspection Committee, "The Role of the CIIC," http://www.ciic.state.oh.us/

[4] CIIC Report on the Inspection and Evaluation of NEOCC, August 22, 2014, p. 6, http://ciic.state.oh.us/docs/Northeast%20Ohio%20Correctional%20Center%202014.pdf

[5] Stephen Koff, "Federal prison in Youngstown might not feel effects of private-prison phase-out," *Cleveland.com* (Aug. 18, 2016), https://www.cleveland.com/metro/2016/08/federal_prison_in_youngstown_u.html

use, overcrowding, neglected medical care, and deteriorating facilities," and calling on the State of Ohio to "follow the lead of the Bureau of Prisons and cancel [its] contract[ ] with [the corporation]."[6]

27. Despite these widely publicized developments, the State of Ohio not only continued to contract with CoreCivic to house inmates at NEOCC, but sought to exploit the space vacated by the federal inmates, causing the ALCU, in December 2016, to decry the decision to "allow[ ] more people to be housed in [the facility that] was deemed unfit for federal prisoners even though the structure and the operation of the prison remains unchanged[.]"[7]

28. In January of 2019, the CIIC's former director, Joanna Saul, complained to the press about the agency having been gutted to the point where it only had one full-time employee—down from a staff of six five years prior—and was "so depleted that it uses interns to evaluate the state's correctional facilities."[8] "There are serious issues within the corrections system in Ohio, and people should be concerned that there is no oversight," Saul said to *The Plain Dealer*, as reported in a piece that also quoted "a late-night email" she wrote to the Ohio Senate before she resigned as CIIC director in 2016. "We have 50,000 people incarcerated, and someone should be asking questions on what happens to the people in those facilities," she wrote, stressing that the state's prison system was the sixth largest in the country and needed "someone—even a staff of just six people—to actually go into prisons, inquire into issues such as use of force, medical care, mental health, the grievance procedure, food services, etc., and objectively report on them" to state officials.

---

[6] "ACLU, Congressman react to CCA losing prison contract," *Cleveland 19* (Dec. 30, 2014), https://www.wkyc.com/article/news/local/northeast-ohio/aclu-congressman-react-to-cca-losing-prison-contract/95-242082743

[7] "Allowing State Prisoners in Federal Private Prison a Mistake for Ohio, Says ACLU," *ACLU Ohio* (Dec. 1, 2016), https://www.acluohio.org/archives/press-releases/allowing-state-prisoners-in-federal-private-prison-a-mistake-for-ohio-says-aclu

[8] John Caniglia, "'There is no oversight:' Staff cuts leave Ohio prison inspections to interns," *The Plain Dealer/Cleveland.com* (Jan. 20, 2019).

29. A few months later, James McCann—a victim of the nationwide opioid crisis who was incarcerated at NEOCC as a prisoner of the State of Ohio, pursuant to the State's contract with CoreCivic, on robbery charges related to his drug addiction—paid the ultimate price for the very lack of oversight about which Ms. Saul, among others, had warned.

30. On May 6, 2019, McCann sought medical attention from NEOCC's medical staff due to sudden and unusual acute chest pain that was aggravated by the act of breathing.

31. As documented by Nurse Mark Weidler, who attended to McCann in NEOCC's medical pod on that day, that McCann was suffering from "acute/sudden onset" chest pain that was "aggravate[ed]" whenever he took "a deep breath." **Exhibit 1**, 5/6/2019 Treatment Note. Weidler further noted that McCann was supposed to "notify the nearest staff member when experiencing chest pain" and scheduled him for an "Advanced Provider Appointment" on May 10, 2019. *Id.*

32. For reasons that are to date unknown, McCann did not attend the May 10 appointment. Plaintiff has served several public records requests on CoreCivic and ODRC, the response to which confirms that there is no record of McCann having received any medical care after the May 6 appointment with Nurse Weidler.

33. On May 11, 2019, consistent with the instructions he received from Weidler, McCann asked Defendant officer Vanhorn, who was on duty in the Charlie 2-4-6 housing unit where McCann resided, to let him go to the medical pod so that he could receive medical attention for his severe chest pain, which had worsened in the days following his May 6, 2019 visit to the medical pod. In requesting access to the medical pod, McCann explained to Vanhorn that his pain was so severe that he could barely move.

34. For no apparent reason and with no conceivable justification, VanHorn denied McCann access to the medical pod and ordered him to return to his cell.

35. The next day, May 12, 2019, McCann was found dead in his cell.

36. The Mahoning County Coroner's Office performed an autopsy on McCann three days later, and issued a report concluding that McCann "died from acute pneumonia," with hypertensive cardiovascular disease "a contributing condition." **Exhibit 2**, Coroner's report, p. 1. According to the Coroner's report, McCann's body was "that of a well-developed, adequately nourished, white male," "appearing to be consistent with the age of 36 years." *Id.*, p. 2.

37. McCann's pneumonia would not have been fatal had he received basic medical attention, including if he had been permitted to visit the medical pod on May 10 as was scheduled by NEOCC's medical staff, or on May 11 as McCann requested.

38. McCann's prison sentence would have expired this September (2021), and he would have been eligible for release as early as November of last year (2020).

39. On May 29, 2019, John Auman, a fellow NEOCC inmate who was personally familiar with McCann, wrote a letter to McCann's family, in which he recalled specifically as follows:

> For almost a whole week before he passed [McCann] was complaining of chest pains. I told him to go to medical. He was being hard headed at first. He got to the point where he was in so much pain he could hardly move. I talked him into going to medical. ... after a few days past he wasn't getting no better. So I talked him into goin back to medical. Well when he tried the C-O Ms. Vanhorn denied him. So he went back to his cell mod. Well the next day is when we found him. He was stiff as a board and purple.

*See* **Exhibit 3**, Affidavit of John Auman, ¶ 10, discussing and attaching his May 29, 2019 letter as Exhibit 1.

40. Auman has further confirmed that inmates could not go to the medical pod at NEOCC unless they were taken there or given permission to go there by a corrections officer or other member of the the NEOCC staff. *Id.*, ¶ 4. In other words, inmates "relied on the NEOCC officers to get any access to medical care." *Id.*

41. Auman has also testified that while he was incarcerated at NEOCC, he regularly witnessed officers deny inmates access to the medical pod or otherwise let them have medical care. *Id.*, ¶ 11.

According to Auman, "there was no rhyme or reason to how [the officers] acted in these situations." *Id.* And of the four different facilities in which Auman has been incarcerated by the State of Ohio, "NEOCC was by far the most disorganized." *Id.*, ¶ 12. More specifically, Auman has explained that,

> [t]here was hardly any structure or consistency in how [NEOCC] operated, they were constantly losing staff members and having to bring in new ones, and it hardly seemed like they had half the number of officers they needed to keep that place in order. I was shocked by the inmate on inmate violence that was allowed to happen in that place compared to the others, and the C.O.s would even tell us that if we were going to fight we should fight in the cells so it wasn't caught on camera and so they wouldn't have to do paperwork.

*Id.*

42. On information and belief, discovery in this case will reveal that the other NEOCC officer Defendants—Armstrong, Bower, Brown, Clayton, Cuevas, Davis, Detchon, Douglass, Fletcher, Hinojos, Kaufman, Lattner, Gonzales, Miller, Miner, Osborn, Pleiss, Plott, Robinson, Sanders, Sturgis, Vanhorn, Walters, and all other officers who were on duty in the Charlie 2-4-6 unit between May 6 and May 12, 2019, and whose names are to date unknown despite Plaintiff's reasonable efforts to identify them—were, like Defendant VanHorn, similarly on notice of McCann's need for medical attention on these dates, and were deliberately indifferent to that need, denying McCann access to the medical pod and the basic care he needed, including to attend his scheduled May 10 appointment.

43. McCann's needless and preventable death directly, proximately, and foreseeably resulted from CoreCivic's failure to train and supervise its corrections officers on their obligation to provide inmates access to basic medical care, and its failure to implement basic systems to ensure the same. These failures were a foreseeable function of CoreCivic's own practices, customs, and policies.

44. Of the hundreds of pages of records produced in response to Plaintiff's requests to CoreCivic and ODRC to date, there is not a single document explaining or even purporting to investigate why McCann never received any medical attention after his initial May 6 appointment.

45. To date, no one at NEOCC, or ODRC has been terminated or disciplined in any way in connection with McCann's death, and neither NEOCC nor CoreCivic has made any effort to improve their processes to ensure against such needless deaths occurring in the future.

## V. Causes of Action

### Count One: Wrongful death – R.C. 2125.01

46. This Count One is asserted against Core Civic, and also against Defendants Hininger, VanHorn and the other officer Defendants in their individual capacities only.

47. Plaintiff incorporates the foregoing paragraphs as if fully rewritten here.

48. McCann suffered an untimely and wrongful death on May 12, 2019, as a direct and proximate result of Defendants' actions and omissions described herein.

49. The actions and omissions of Vanhorn and the other NEOCC officer Defendants in denying McCann access to medical care and ignoring his obvious medical needs, as described herein, constitute negligent and wrongful conduct, as well as wanton neglect and disregard of McCann's rights as an inmate.

50. CoreCivic, a corporation with the purpose of maintaining and operating a prison, is liable for the torts of its employees under the doctrine of *respondeat superior*. *See Avellone v. St. John's Hosp.*, 165 Ohio St. 467, 467, 135 N.E.2d 410 (1956), paragraph one of the syllabus.

51. Additionally, CoreCivic and Hininger, who is ultimately responsible for the company's operations, are directly liable under R.C. 2125.01 for their negligent and wrongful conduct in failing to train the company's officers, and failing to implement basic systems and procedures to ensure communication between medical staff and jail officers and otherwise ensure that inmates' basic medical needs are met.

52. Plaintiff, in his capacity as the administrator of McCann's estate, claims damages under R.C. 2125.01 for the exclusive benefit of the estate's beneficiaries and next of kin.

53. As a direct and proximate result of McCann's wrongful death, the estate and the estate's next of kin have and will forever suffer a loss of support from the reasonably expected earning capacity, services, and society of McCann, including a loss of love, companionship, consortium, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, in addition to mental anguish, funeral and burial expenses, and all other injuries and damages set forth in Ohio's wrongful death statutes. Additionally, Defendants' conduct directly and proximately caused McCann to suffer extreme pain and suffering for which the estate is entitled to recover, along with punitive damages and attorneys' fees.

54. But for the deliberate indifference and other acts and omissions of Defendants alleged herein, the estate and the estate's next of kin would not have suffered the injuries and damages set forth in the preceding paragraph.

### Count Two: Eighth Amendment Violation under 42 U.S.C. § 1983
### Deliberate indifference to a known and obvious medical need

55. This Count Two is asserted against Defendant VanHorn and the other NEOCC officer Defendants in their individual capacities only

56. Plaintiff incorporates the foregoing paragraphs as if fully rewritten here.

57. The Eighth Amendment guarantees inmates the constitutional right to receive adequate medical care and attention while incarcerated, and further prohibits prison officials from unnecessarily and wantonly inflicting pain upon inmates by acting with deliberate indifference to their serious medical needs.

58. As alleged above, the officer Defendants were aware of McCann's severe pain and need for medical care, and were deliberately indifferent to that need. Defendant officers knew that McCann had visited the medical pod on May 6, 2019, where he was diagnosed with "acute/sudden onset" chest pain that was "aggravate[ed]" whenever he took "a deep breath," and where a follow-up "Advanced Provider Appointment" was scheduled for May 10. Defendant officers were charged

with conducting daily rounds to check on all of the inmates in the Charlie 2-4-6 unit between the dates of May 6 and May 12, had heard McCann's complaints of chest pain, knew that this pain left him immobile in his cell. Despite this knowledge, and despite the specific documented instruction by NEOCC's medical staff that McCann "notify the nearest staff member when experiencing chest pain," Defendant officers denied McCann access to the medical pod, including to attend his scheduled "Advanced Provided Appointment" on May 10. Further, Defendant VanHorn specifically denied McCann's direct request to her for access to the medical pod on May 11, the day before he died.

59. Thus, the officer Defendants willfully and deliberately ignored a substantial risk of serious harm to McCann's health and safety despite knowing that this risk existed.

60. By willfully and deliberately ignoring McCann's need for medical attention, the officer Defendants unnecessarily and wantonly inflicted pain upon McCann, which resulted in conditions of incarceration that not only posed a substantial risk of serious harm to McCann's health and safety, but that were the proximate cause of his unnecessary and preventable death.

61. Defendants' acts in deliberately ignoring McCann's need for medical care were undertaken knowingly and intentionally, with malice, with a conscious disregard of McCann's rights and interests, and with certainty of inflicting harm and damage on McCann.

62. Defendants' acts were further willful, egregious, malicious, and worthy of substantial sanction to punish and deter these Defendants and others from engaging in this type of unlawful conduct.

### Count Three: Failure to Train and Supervise under 42 U.S.C. § 1983

63. This Count Three is asserted against Defendant CoreCivic, and also against Defendants Chambers-Smith, Mohr, and Hininger in their individual capacities.

64. Plaintiff incorporates the foregoing paragraphs as if fully rewritten here.

65. Pursuant to established patterns, practices, policies, or customs—including its failure to implement basic communications and records systems between its corrections' officers and medical staff—CoreCivic failed to train and supervise its officers on their duty to provide inmates access to adequate medical care or how to respond to the medical needs of such inmates despite it being patently obvious that such training was necessary.

66. Similarly, Defendants Chambers-Smith and Mohr, who were ultimately responsible during their respective tenures as ODRC Director for supervising the State's contract with CoreCivic, abandoned their duty to ensure NEOCC inmates' access to basic medical care, and did so "in the face of actual knowledge of a breakdown" of the same. *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir.1992); *See also Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir.1995) ("A jury could find ... that [the warden] personally had a job to do, and that he did not do it. A jury could find that the fact that [he] was under constant pressure to transfer inmates due to overcrowding would not excuse his failure to adopt reasonable policies to insure that the transferees were not placed in grave danger..."). Defendant ODRC Directors failed to audit and supervise NEOCC procedures, thus authorizing, approving, and acquiescing in the unconstitutional conduct alleged herein.

67. CoreCivic's patterns, practices, customs, and policies as described herein, and the authorization and/or approval of the same by Chambers-Smith, Mohr, and Hininger, independently, directly, and proximately served to deprive McCann of his Eighth Amendment right to receive adequate medical care and attention while incarcerated and to be free from the cruel, unusual, and unnecessary death inflicted upon him by the deliberate indifference to and wanton neglect of his medical needs. As a direct and proximate result of this deprivation, McCann suffered a wrongful and untimely death, and the Estate and the Estate's next of kin have suffered and will continue to suffer economic and non-economic damages for which CoreCivic and Chambers-Smith and Mohr are liable, including mental, emotional, and physical pain and suffering.

### VI. Prayer for Relief

Wherefore, Plaintiff prays for judgment against all Defendants, jointly and severally, in an amount in excess of $75,000 together with attorneys' fees, costs, expenses, and any other relief to which the Estate may be entitled or that the Court deems equitable and just.

### VII. Jury Demand

Plaintiff demands a trial by jury on all issues within the Complaint.

Respectfully Submitted,

*/s/ Peter Pattakos*
Peter Pattakos (0082884)
THE PATTAKOS LAW FIRM LLC
101 Ghent Road
Fairlawn, Ohio 44333
Phone: 330.836.8533
Fax: 330.836.8536
peter@pattakoslaw.com

*/s/ Antonios P. Tsarouhas*
Antonios P. Tsarouhas (0064110)
PERANTINIDES & NOLAN, CO., L.P.A.
300 Courtyard Square
80 South Summit Street
Akron, Ohio 44308
Phone: 330.253.5454
Fax: 330.253.6524
tony@perantinides.com

*Attorneys for Plaintiff Don McCann III, Administrator of the estate of James Daniel McCann*